## Woods v. Kentucky Traction & Terminal Co.

(Decided Feb. 3, 1933.)

(As Modified on Denial of Rehearing Dec. 15, 1933.)

EDWARD C. O'REAR, ROBERT FRANKLIN, DAVID D. CLINE and W. E. DARRAGH for appellant.

ALLEN, BOTTS & DUNCAN and WALLACE MUIR for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

This is an appeal from a judgment of the Fayette circuit court awarding the appellee, Kentucky Traction

& Terminal Company, a new trial upon the grounds of newly discovered evidence and also granting a cross-appeal to the appellee from so much of the judgment as restricts the retrial granted to the one question of the amount of damages.

The facts and circumstances leading up to the judgment here complained of as erroneous in awarding the appellee a new trial are briefly as follows:

In February, 1927, Pauline Jacqueline Romans (now Pauline Jacqueline Woods) claimed to have been seriously and permanently injured while a passenger upon one of appellee's cars, operated as a part of its street railway system in Lexington, Ky., by coming in contact with one of its broken trolley wires while attempting to alight or escape from the car.

In September, 1927, the appellant, Pauline Jacqueline Woods, complaining of the injuries received in this accident, instituted an action seeking recovery of damages therefor, alleging that the same were directly caused by the negligence of the appellee traction company, its agents, servants, and employees, upon the occasion stated, in the operation and mantenance of its railway system.

In her petition, she alleged that upon the occasion in question, and while a passenger upon one of the appellee's cars, appellee's trolley wire broke and fell, dangling upon the top and over the side of the car while highly charged with electricity; that confusion and panic among the passengers were caused thereby, when appellee's motorman in charge of the car directed them to all leave the car through its rear door; and that, when acting in compliance with such instruction, in alighting from the car, she came in contact with the dangling end of this highly charged broken trolley wire, which struck her upon her left arm, causing a severe electric shock, which knocked her unconscious; and that also as a result of this shock she became afflicted with traumatic neurosis, with its attendant symptoms and manifestations of hysterical or functional paralysis of her left leg and the left side of her body, with photophobia, or dread of light, and with a psychological reaction to all things electric; and further, as a result of this shock, she suffered pains in her back and head and also with anesthesia and hyperthesia in her left

hip and leg; that the accident had caused her to be in a "pained and pitable condition of traumatic neurosis, with functional paralysis of her left leg, from all of which aforesaid injuries she has, does and in all human probability will continue to suffer great physical pain and mental anguish while yet she lives."

Further, appellant filed amended petition, alleging that by reason of this accident she was permanently injured and her power of earning money permanently impaired on account of her injuries.

The appellee (defendant in the original action) filed answer traversing the averments of the petition and pleading contributory negligence, to which reply was in turn filed, denying the plea.

Upon the trial of this cause in March, 1928, the jury awarded the plaintiff a verdict for $15,000.

From this verdict and judgment entered thereon, the defendant traction company appealed to this court, which was on December 6, 1929, affirmed in the action of Kentucky Traction & Terminal Co. v. Roman's Guardian, 232 Ky. 285, 23 S. W. (2d) 272. Reference is made to the court's opinion therein reported for a full statement of the facts of the case.

Upon the original trial, much proof was heard by the jury upon issues joined as to whether or not the defendant traction company was guilty of negligence in the operation of its railway system upon the occasion in question, whether, if negligent, its negligence was the direct or proximate cause of plaintiff's injuries alleged received by her through coming in contact with its broken trolley wire, and, if such injuries were so received, what was their character and extent, whether temporary or permanent.

Upon this latter issue, the expert testimony offered both by the plaintiff and defendant was that the electric shock alleged suffered by plaintiff had produced traumatic neurosis; that the functional or hysterical paralysis of her left leg, resulting from her nervous shock, it was agreed, according to the expert testimony heard, was likely to prove to be an injury of very short duration. Dr. McGinnis, her family doctor, stated that in his opinion the leg paralysis would likely prove to be of permanent character. However, there was very little conflict in the testimony of all these expert wit-

nesses, that the shock to plaintiff's nervous system, produced by her accident, was of permanent character, which would likely remain with the plaintiff indefinitely or permanently, though predicting for it varying degrees of severity.

Plaintiff in her evidence detailed her suffering and disability alleged caused by her accident, it appears, very impressively, submitting her version of the accident and her resulting hurt, injuries, and suffering therefrom.

It is not contended, however, that the evidence given upon this trial undertook to go further than to relate and explain the facts and circumstances under which plaintiff received her injuries and her then actual condition resulting therefrom as testified to exist at the time of the trial. It is not contended that plaintiff's leg paralysis complained of did not at that time in fact exist and was as reported and described by all the expert testimony to be, though differing as to its cause, nor that she had not suffered a severe shock to her nervous system. While claim was made and pleaded by defendant that fraud was practiced by plaintiff and witnesses on the trial by their misrepresentation or giving of false evidence as to the gravity and cause of her injuries and of her then condition and issues were made as to whether same were due to fright or actual contact with appellant's broken trolley wire, yet upon these issues the jury, found under proper instructions adversely to appellant or, in other words, that appellant was not malingering but was injured as claimed.

Of course, it must be conceded that even the expert testimony, when undertaking to predict the future extent and duration of the plaintiff's injury to her nervous system and paralysis of her leg, was of necessity in the nature of opinion evidence, being, in fact, but the forecasting or prognosis of these various experts as to how long plaintiff's then nervous or paralyzed condition would in their opinion continue or when and what partial abatement or recovery from either or both could be expected.

The defendant company claimed upon the trial that plaintiff's injuries, both as to her functional paralysis as well as her alleged wrecked nervous system, were only of temporary character, and complained that the

jury's verdict in awarding plaintiff $15,000 as damages was excessive.

However, upon its appeal of this cause, the court in its opinion affirming the judgment held the award to be not excessive, as being one based evidently upon the jury's finding that plaintiff's injuries were permanent. The language of the opinion, however, does not hold that all of plaintiff's injuries were by the jury found to be of permanent character. In fact, the language of the opinion, which is as follows, strongly indicates otherwise:

"At the time, and for some time after her injury, plaintiff was treated by her family physician, Dr. McGinnis. Later on she was taken to Covington, where she was examined by Dr. Hoppe, an eminent physician, and by his assistant, Dr. McIntyre. She was examined by Dr. Barrow, Dr. Bradley, Dr. Trapp, and Dr. Clark, able physicians of Lexington. These physicians all testified that she is suffering from traumatic neurosis, or common hysteria. They all agree, however, that her left leg is now paralyzed, but say this paralysis will disappear some time after the litigation has come to an end, but that she will probably be somewhat nervous after her recovery.* * *"

It should be noted from this quoted part of the court's opinion rendered upon this first appeal that the court, in considering appellee's complaint that the verdict was excessive, as based upon a finding that the plaintiff's injuries were permanent, expressly calls attention to the fact that the evidence before the jury, upon which its finding was based, was to the effect that, in so far as it referred to plaintiff's functional paralysis of her leg, it would prove to be only of a brief or temporary character, thus compelling the conclusion that, if the jury made the award, as seems probable, upon a finding of permanent injury, it was for such part of her injuries as the evidence relating thereto tended to show were of permanent character, as was the evidence regarding the wrecking of plaintiff's nervous system.

In November, 1929, shortly prior to the affirmance by this court on December 6, 1929, of the lower court's judgment appealed from, the defendant traction com-

pany filed its independent suit against the plaintiff, seeking a new trial of the original action, wherein plaintiff had recovered in March, 1928, the complained of judgment against it.

This newly discovered evidence, upon which a new trial is asked, the appellee traction company contends, is of such "decisive nature" as to unerringly show that appellant's injuries found by the jury to be permanent prove they are not in fact such, inasmuch as this newly discovered evidence clearly shows, it insists, that she has, subsequent to the trial, recovered therefrom, thus reasonably demonstrating that they were not permanent but of temporary character only. Therefore appellee argues that as the jury's award was based upon a found condition of permanent injury which this later discovered evidence shows did not exist, it insists that it is entitled to a new trial, wherein it may establish by this alleged new proof the true facts as to appellant's claimed injury, to the end of securing a reversal of the jury's unwarranted and erroneous finding of damages based thereon against it. While this is the ground upon which a new trial is asked, yet appellee would, of course, upon being granted the new trial, undertake a retrial de novo of all the issues involved upon the original trial and would likely again contend and seek to show by perhaps the same witnesses used before that appellant's claim that she had been injured by contact with the appellee's broken trolley wire was a fraudulent claim and also that she was malingering in claiming serious or permanent injury to have been thereby caused her.

However, we do not consider the fact that appellee would make such use of a new trial by attempting to again "thrash out old straw" as to these issues decided by the jury adversely to appellee upon the original trial, makes its petition here made for a new trial one based on fraud rather than one grounded upon the claimed fact of appellant's subsequent recovery, showing her injuries to have been but of temporary character, and therefore that the verdict was excessive as based upon injuries, now shown to have been but temporary, and therefore the judgment thereon should be reversed.

Appellee's new evidence goes to show appellant's

alleged subsequent recovery from nervous disorder was the basis for the new trial sought by it, rather than claim made of its discovery of new evidence tending to show that fraud was practiced by appellant and her witnesses upon the former trial as constituting its ground for a new trial, and except only indirectly as it may argue fraud as an inference based upon her alleged later recovery, the appellee does not bottom its claim for a new trial upon the ground that its newly discovered evidence is directed to establishing or showing that fraud and deceit were practiced by appellant and her witnesses upon the former trial by their knowingly and fraudulently testifying to the existence of certain conditions and then matters of fact, which they then knew or should have known were in fact untrue, and that by virtue of such misconduct and fraudulent practice and testimony appellant fraudulently secured through it the complained of verdict based thereon. Such is not the gravamen or real grounds of appellant's petition for a new trial here before us, and therefore we conclude the same is not to be treated as one based upon grounds of fraud.

Appellee filed this suit in equity, seeking the vacation of the former judgment and a new trial of this former action under and pursuant to section 344 of the Civil Code of Practice which provides:

"If grounds for a new trial be discovered after the term at which the verdict or decision is rendered, the application may be made by a petition filed with the clerk not later than the second term after the discovery—on which a summons shall issue, as on other petitions, requiring the adverse party to appear and answer it on or before the first day of the next term."

And further, as authorized under the provisions of section 340 of the Civil Code of Practice which provides that a new trial may be granted on the application of the party aggrieved, if his substantial rights have been materially affected, for (subsection 7) "newly discovered evidence, material for the party applying, which he could not, with reasonable diligence, have discovered and produced at the trial."

The appellee, as plaintiff in this second suit, alleged that, since the rendition of the judgment against it upon

the trial of the former action in March, 1928, it had newly discovered and could show by certain named witnesses, if granted a new trial, that the appellee or plaintiff in the former action had, in August 1928, following the trial, married one Hubert Woods, and there was born to her on March, 1929, following as the issue of her marriage a child; further, that appellee and husband had moved to Cincinnati in March, 1929, where she was living with her husband and baby in a certain apartment there, where she was keeping house, doing her household work, nursing her baby, and walking about her house and the streets just as a normal person, thereby showing that she had recovered the use of her left leg, claimed upon the former trial to be paralyzed, and for which loss of its use thereby occasioned heavy damages had been awarded her. Also it was alleged that it had further newly discovered that the defendant, Mrs. Woods, had in the late August of 1929 made a trip to Jacksonville, Fla., with her mother and baby, where she remained some four or five weeks visiting her aunt, Mrs. Lamb, and also staying with Mrs. John Pfiester there, and had also gone to Miami during this time, and that it would show by witnesses, with whom she was frequently associated while in Florida, that she acted and had so recovered as to be and act in her appearance and conduct as a well and normal person.

A demurrer was filed to this petition and sustained by the lower court, upon the grounds that the newly discovered evidence was only cumulative in its nature, inasmuch as it only tended to show Mrs. Woods' recovery from the hysterical paralysis of her leg, which practically all the evidence introduced upon the original trial showed was but temporary in its character and would soon abate, and that the newly discovered evidence claimed to have been discovered by plaintiff traction company only tended to show the testimony of the experts given upon the first trial to have been true and therefore was insufficient to justify the granting of a new trial, in that it failed to show or tend to show a recovery by the defendant from the wreck of her nervous system, which, by the evidence introduced upon the first trial, was described as being a permanent injury suffered by Mrs. Woods in her accident.

Further amended petitions were filed by plaintiff

traction company, wherein it was averred that it had newly discovered since the trial evidence that would show defendant had fully recovered both from her leg paralysis and the injury to her nervous system and had become a well and normal person since the former trial in all respects.

Defendant filed demurrer to these amended petitions, which was overruled by the court, whereupon issues were formed by appropriate pleadings and a large amount of testimony taken on both sides. Thereafter, the case being finally submitted, the lower court granted appellee a new trial, from which judgment appellant prosecutes this appeal.

The courts, upon considerations of public policy, as a rule are not favorable to the granting of new trials, on newly discovered evidence claiming to show a changed condition subsequent to trial which, as has been said, "may tend to imperil the security of judgments, may lead to interminable delay in arriving at definite determinations in actions, may be productive of multitudinous and exasperating applications for new trials in cases particularly were verdicts rest in any degree upon expert evidence as to future resultant conditions reasonably to be apprehended." Especially are they inclined to regard with disfavor evidence as to subsequent events disproving the character or extent of bodily injury for which recovery was had, as where subsequent to a trial for damages for personal injuries something occurs showing that the bodily condition of plaintiff was not such in fact as it was supposed to be by the jury.

In the present case, the newly discovered evidence purports to show a change subsequent to the trial in the condition of appellant or a subsequent recovery by her from injuries which upon the trial were then considered permanent by the jury, and in which finding, it is claimed, the newly discovered evidence tends to show it was mistaken.

We do not understand that the subsequent events, which it is claimed the newly discovered evidence tends to show, constitute evidence of any fraud, perjury, or malingering practiced upon the part of appellant. However, it appears conceded that appellant's condition, as to the nature of her injuries, at the time of the trial, was real and in fact then existed as represented by the

evidence, but it is here contended that the newly discovered evidence will show that such part of those injuries as was then believed and considered, according to the evidence then before the jury, to be permanent in character, will, by this newly discovered evidence as to subsequent events, be shown that they were not in fact such, but only temporary, in that, while the appellant was then lame, it will show that she is now well and can walk, and, while then the victim of nervous shock, that she has now recovered therefrom and that her nerves are now sound and normal.

As said by this court in the case of Louisville & N. R. Co. v. Ueltschi's Ex'rs, 126 Ky. 556, 104 S. W. 320, 321, 31 Ky. Law Rep. 931:

"New trials are reluctantly granted; and, when disputed matters have been fully litigated, the courts will not reopen a case for the purpose of enabling the defeated party to introduce new evidence, unless the reasons why it should be done are very strong, and it is made to appear with reasonable certainty that injustice or wrong would result unless the relief was granted, and another opportunity allowed to relitigate the questions in issue. This court has frequently had before it applications for new trials upon the ground of newly discovered evidence, and it has uniformly been held that a new trial will not be granted when the point upon which it is sought was in issue in the former trial, unless the discovered evidence be of such a permanent and unerring character as to preponderate greatly or have a decisive influence upon the evidence to be overturned by it. And especially does this rule obtain with respect to parol testimony. Price v. Thompson, 84 Ky. 219, 1 S. W. 408 [8 Ky. Law Rep. 201]; Torain v. Terrell [122 Ky. 745], 29 Ky Law Rep. 306, 93 S. W. 10; Mercer v. Mercer, 87 Ky. 21, 7 S. W. 307 [9 Ky. Law Rep. 870]; Allen v. Perry, 6 Bush [Ky.] 85; Richardson v. Huff, 43 S. W. 454, 19 Ky. Law Rep. 1428."

Again in 20 R. C. L. sec. 75, page 293, it is said:

"In order to sustain an application for a new trial on the ground of newly discovered evidence it must appear that such evidence is admissible and material under the pleadings, and it must go

to the merits and not merely to discredit or impeach a former witness. Evidence on a matter collateral to the issue, or which goes only to the measure of damages, is not ground for a new trial. Nor is it sufficient that the new evidence, had it been offered in the trial, might have changed the judgment. It must be sufficiently strong to make it probable that a different result would be obtained in another trial. The new evidence must be of a decisive and conclusive character, or at least such as to render a different result reasonably certain.''

To like effect, see the rule announced in National Concrete Const. Co. v. Duvall et al., 153 Ky. 394, 155 S. W. 757, 761, a case closely analogous in its facts and character of new evidence set out as follows:

''In this connection it should be kept in mind as a matter of controlling importance that this testimony was given in May, 1911, and the petition charges that the pregnancy of his wife took place more than a year afterwards. During this long interval of time it is entirely reasonable that Duvall should have recovered to some extent, if not altogether, from some of the injuries he testified concerning on the trial. Nature, aided by medical skill, can accomplish wonders in a year's time, and everything to which Duvall, as well as the medical witnesses, testified on the trial might have been then absolutely true. The fact that his condition subsequently improved and that his manhood was restored furnishes little, if any, ground for the inference that at the time of the trial his statements were false. If a new trial should be granted in this case, then in every case in which damages for personal injuries were recovered, upon evidence that an arm or a leg or any member of the body was impaired in strength or usefulness at the time of the trial, if it could be shown that subsequent to the trial the injured member had been cured or the aches and pains from which the complaining party suffered had been relieved, a new trial must be had. If this rule were adopted, there would be no end to litigation in this class of cases, and persons who sustained substantial injury and recovered substantial judgments would be obliged to continue

in their misery, or make a pretense of it long after the trial, to avoid the expense and vexation of an attempt to take from them a recovery that under the evidence they were entitled to.

"Generally when a new trial is asked on the ground of newly discovered evidence, the purpose is to correct a judgment obtained by false or misleading evidence given on the trial, and that had material weight in influencing the decision. But here the newly discovered evidence would not disprove a single fact testified to on the trial, as the manhood of Duvall may have been impaired at the time of the trial, and all that was said by both him and his medical witnesses have been true, and the injury or impairment in this respect have disappeared a year afterwards. The evidence upon which a new trial is here sought concerns things that had no existence in fact at the time of the trial, but that arose subsequent to it and did not, with any degree of certainty, tend to show that anything that took place on the trial was either false or misleading."

In such respect is the case of Anshutz v. Louisville Railway Co., 152 Ky. 741, 154 S. W. 13, 15, 45 L. R. A. (N. S.) 87, to be distinguished in its facts from the present case and also from the Duvall Case supra, as in the latter case the court in its opinion expressly distinguished it from the Anshutz Case, saying:

"In that case the material evidence in behalf of the plaintiff Mrs. Anshutz in a personal injury action proved that the injury received by Mrs. Anshutz had destroyed her ability to bear children and had further developed a tumor that must be removed by a serious and dangerous operation. On the strength of this uncontradicted and controlling evidence Mrs. Anshutz recovered a substantial sum, and a new trial was granted upon it being made to appear that several months after the trial Mrs. Anshutz gave birth to a child and that the alleged tumor was in fact a foetus."

The appellee very earnestly insists and relies upon the authority of this Anshutz Case, supra, as in its principle and rule of law justifying and supporting the lower court's granting it a new trial in the instant case.

We are, however, unable to agree that it is an authority supporting appellee's contention upon what we conceive are the very different facts presented upon this appeal. There it was shown by all the physicians and surgeons who had been present at the operation upon Mrs. Anshutz that there were at such time removed from her body both fallopian tubes, the whole of the left ovary, and a part of the right ovary, with the result that she was thereby made barren and could never have another child, and further they testified that there had developed a tumor in the abdomen of Mrs. Anshutz, which would later necessitate still another serious operation. "If this operation had been performed, as testified to by the doctors—that is, if the fallopian tubes had been removed—Mrs. Anshutz could not have had a baby, but she did have one, and the tumor turned out to be a boy."

In this case there was positive and certain testimony by the two doctors who themselves performed the operation that they had removed these certain sexual organs from Mrs. Anshutz, with the result that she would be forever thereafter barren.

The evidence complained of in the Anshutz Case was positive and conclusive on the point and in the application there made for a new trial, upon the grounds of newly discovered evidence, that she had, since the trial, given birth to a child.

The movant claimed conspiracy on the part of the two doctors and Mrs. Anshutz and pleaded fraud.

In the instant case, no allegations in the various petitions seeking a new trial are made of fraud, conspiracy, or perjury yet there the court, in considering the petition for a new trial upon the peculiar and exceptional facts of that case alleged discovered by the new evidence, said:

"There must, of course, be an end to all litigation, and the law requires of litigants that they shall use diligence in procuring and offering their evidence; but the sections of our Code, above quoted, were intended to apply to that class of cases where, from a combination of peculiar circumstances or unfortunate occurrences which could not be foreseen, there has been a miscarriage of justice, and the facts of this case are strongly illustrative of the wisdom of those provisions."

And, despite the allegations of the petition as to fraud and conspiracy, averred that "in its final analysis it is nothing more than a suit under section 344 of the Civil Code for a new trial upon the ground of newly discovered evidence by reason of the subsequent birth of the child by Mrs. Anshutz."

In the Anshutz Case, supra, the concluding words of the opinion are:

"This court has many times dealt with and ruled upon applications for a new trial, and as a rule has denied them, but at the same time has fully upheld the provisions of our Code and applied them in proper cases. * * *

"From an examination of all these cases, the rule is to be deduced that where the newly discovered evidence is of such conclusive nature, or even of such decisive or preponderating character as that it would, with reasonable certainty, have changed the verdict, or materially reduced the recovery, a new trial should be granted, if it is satisfactorily shown why the same was not discovered and produced at the trial."

Or, as said in the Duvall Case, supra, "a new trial should not be granted in personal injury cases merely because the party who obtained damages recovered from the effects of the injuries that existed at the time of the trial and that were the basis of the recovery in his behalf unless it should be made clear that the evidence on the trial showed with certainty that the injuries were permanent or incurable, and that this evidence had a controlling effect on the decision, and that subsequent events established that they were neither permanent nor incurable."

Also, in the later case of Powell v. Galloway, 229 Ky. 43, 16 S. W. (2d) 492, Galloway recovered judgment against Dr. Powell, evidently in a malpractice suit, claiming that his hands and fingers were stiff, deformed, and permanently impaired. In the action he recovered judgment for $3,000, based on his own testimony that the injury was permanent. After trial, suit was brought under sections 343 and 344 of the Civil Code of Practice asking a new trial on the ground of newly discovered evidence; it being that after the trial Dr. Powell learned that Galloway had played baseball and had worked upon

a farm as a hand at a hay baler, both employments requiring the use of his crippled hand, and that these facts were unknown to him at the time of the trial.

Considerable testimony was introduced showing that Galloway had worked at the hay baler, had played baseball, and performed other labor requiring strength in the injured arm, but there was contradictory evidence that Galloway was unable to make a hand at the hay baler, that he was excluded from the ball team, and that his exertions were not incompatible with his injuries. The court declined to grant a new trial. Later, in passing on the case, this court said:

"The rule is that newly discovered evidence, in order to authorize the granting of a new trial, must be of a decisive nature, and such as to render a different result reasonably certain. If it is merely cumulative, or in sharp conflict, it will not authorize a new trial. * * * Our examination of the evidence discloses that it was in sharp conflict, and was not of such certain and unerring character as to have been decisive of the issue involved."

After a careful reading and re-reading of the diametrically conflicting evidence introduced by the parties and heard upon the issues formed by the petition and responsive pleadings for a new trial, and after a mature consideration of the many authorities cited by counsel for the parties, as well as many others, found by us both in authoritative texts and well-considered cases, both domestic and of our sister states, we have at length concluded that the applicable rule and principles of law for the just and rightful determination of the question here presented of appellee's right to a new trial of its lost cause are correctly and justly stated in the Duvall and Powell Cases, cited supra, and are here controlling.

The evidence offered in this case by appellee in support of its petition and amended petition for a new trial, especially in so far as it involves the controverted question of appellant's recovery from her nervous condition, or as to whether as claimed by the appellee company she is now normal or otherwise, or has either partially or entirely recovered from her nervous shock, is here again based for the most part on opinion evidence, much of the same kind and character as was the conflicting evidence given by the experts and other wit-

nesses of appellee as to the nature and extent of appellant's nerve shock injuries, heard upon the original trial. It is true that appellant's testimony and that of her witnesses is that her nervous disorder was caused by her wire contact and was and is yet manifested by certain twitchings of her face, while appellee's witnesses testify as to seeing her on numerous occasions when they didn't observe these twitchings, and therefore they state that she is by force of this testimony, tending to show recovery, now normal and not now suffering from any nervous disorder. Appellant's witnesses, for the most part her friends, and those frequently with her, state, on the contrary, that they are in a position where they can and do still now observe the nervous twitching of her face. Thus it appears that the newly discovered evidence offered by appellee is strongly contradicted by the testimony of appellant's witnesses as to her non-recovery since the original trial and therefore can hardly be said to measure up to or satisfy that standard of being evidence of such unerring character and decisive nature in showing appellant's claimed recovery as to render a different result reasonably certain upon another trial.

It would serve to unduly extend this opinion to cite and discuss in full the voluminous evidence taken by the parties, either in support of appellant's contention that her injuries are even now, more than some four years after the trial, still found to be of a distressing and permanent nature, as shown by the evidence offered upon the original trial, or, on the other hand, in detailing the newly discovered testimony of all the witnesses whose testimony is offered in support of appellee's contention that appellant's injuries were in fact shown by it to be only temporary in character, as contended for by it upon the original trial.

The appellee offered as its newly discovered evidence the testimony of several experts, among whom were Drs. Redmon, Handley, Bradley, and Beatty, in support of its contention that she had recovered from her nervous condition and also from the functional paralysis of her leg.

Dr. Redmon's testimony, it appears, is based upon his judgment formed upon his study of a photograph of appellant, showing the sagging of one of her breasts,

which he states is not the result of traumatism, not upon any special examination made of her and without ever having seen her, while that of Dr. Bradley is given, it appears, without having seen or examined the appellant since 1927. Dr. Handley's testimony is to the effect that he first saw appellant May 5, 1930, but only for a few minutes, as he referred her to Dr. Beatty for treatment, but that at the time he saw no twitching of the face or nervousness more than any other pregnant woman would display.

The testimony of Dr. Beatty, who treated appellant during her pregnancy for a few weeks in May, 1930, is given without claiming that it is based upon an examination made of appellant's nervous condition, but rather only as a witness who had seen the appellant during his treatment of her. He states he had observed nothing abnormal or unusual in her walk and knew nothing of any accident she had sustained and saw no nervous twitching of her face until after he had found out about her accident.

It is to be observed that this expert testimony upon the question of appellant's nervousness alleged manifested by twitching of her body and face goes no further than that these witnesses merely noticed nothing that in their judgment would indicate nervousness and saw no twitching, amounting only to an expression of opinion rather than clear, conclusive, and decisive evidence measuring up to the standard necessary to upset the judgment in that case.

It is further testified for appellee by the Misses Mitchells, who lived upon an upper floor of an apartment also occupied by appellant and family for about a year, that during such time appellant did most of the work in looking after her house and child, walked about the apartment and on the streets, and ascended the stairs, and that they saw no twitching of her face indicating nervous disorder; and also that, when appellant went to Florida in September, 1929, she told them she was going to North Carolina. Also the depositions of some eight witnesses were taken by appellee as to her condition while upon this stated month's visit in Florida. This testimony was given by Mr. and Mrs. John W. Pfeister, Calhoun Lomax, J. S. Harrison, Jr., R. W. Feimster, Clarence Robinson, Edna Albritton, Elsie Steele, and John S. Walsh, and is to the effect that they

were with and saw the appellant on one or numerous occasions; casually or intimately, upon which occasions they noticed no lameness or dragging of her left foot when walking nor any twitching of her face or jerking of her body indicating extreme nervousness.

Mr. and Mrs. Pfeister, with whom appellant boarded for some three or four weeks while visiting Jacksonville, say that they were with her daily during such period but saw nothing unusual as indicating lameness or nervousness on her part or any twitching of the face, but that she was a slight, frail woman, and Mrs. Pfeister often looked after her baby for her as she was fond of children.

Mr. Feimster says that he met her about the 1st of October, 1929, after her return from Miami and after she had sprained her ankle; that he met her when she was lying in bed and spent many hours in her company while they were alone together; that he sat out with her in a car in front of her aunt's house until 12 o'clock, when he took her up and brought her to the porch; also he states that he spent an evening alone with appellant in her aunt's home, and that her uncle and aunt, Mr. and Mrs. Lamb, ran a ''speak-easy joint'' in their home; that he saw the appellant try to dance; also that she stated she had loved to go to some nearby pleasure resort, where she had gone and danced before spraining her ankle while in Miami; also that her uncle and aunt had served them drinks and invited him to meals while she was visiting them.

John Walsh states that he went to the Lamb home to get some home brew and whisky, where he saw appellant entertaining some man in the dining room, playing cards and the Victrola, and kinder dancing around, keeping time to the Victrola; that he was there about ten minutes and that the girl appeared all right.

Further witnesses Bernard, Worsham, and Ostrogge testified nothing as to the appellant's physical condition while visiting the Lambs. They were introduced for the purpose of making an attack on appellant's aunt and uncle as running a ''speak-easy joint.''

Joe Winn saw appellant a short time at his garage, but saw nothing wrong with her, no twitching of her face or anything unusual in her walk.

J. S. Harrison testified that he saw Mrs. Woods

come out of a house and get into a car and powder her nose, also a man carry a child to an automobile which was then about one-half block distant from appellant's; that the appellant walked in a normal way, and that he noticed nothing peculiar about her face; that Mrs. Woods got out of the car and went into a Kress store, when she seemed to be in a hurry; that he could not tell whether she had long or short hair, but he could tell that she appeared to be an attractive woman.

We are unable to appreciate the significance and substantial quality of this character of evidence, much of it based upon brief and casual observation bearing upon the physical condition of Mrs. Woods, covering a period of time from February, 1927, up to and since this her visit to her kinspeople in Florida in September, 1929 as her physical condition involved not only the question of her ability to walk and her sporadic facial twitching, but also the condition of that ''invisible arrangement known as her nervous system.''

Testimony or opinion evidence, based on or deduced from the impression of nonexpert observers or companions during these brief, or long, casual meetings will hardly be considered to possess such special potency and probative quality and substance as to afford the cogent, forcible, and conclusive new evidence, which appellee contends it has now discovered, sufficient to establish and prove the appellant's injuries to have been temporary.

Appellee contends that it should not be denied a new trial, in which to offer this new evidence, upon the ground that it is merely cumulative or contradictory in its nature or tends to impeach the appellant or her witnesses upon the former trial, in that this evidence is of a higher grade and class of evidence than that there offered and heard as to the permanent character of appellant's injuries, for that was at the time of the trial a subject upon which appellee was not prepared, nor could it have been prepared, to then secure evidence by which to successfully show that appellant's injuries were not permanent or to then meet the testimony of her witnesses that her injuries were of a permanent nature, but that this later discovered new and direct testimony now makes certain the temporary character of appellant's injuries, which was then in doubt; that the offered evidence is not therefore cumulative, in that

it is additional evidence of a different kind and higher grade not then in existence and for such reason then not discoverable; and that, if permitted to introduce this new evidence upon a new trial, it, appellee contends, could be reasonably expected to reduce or altogether change the verdict.

We much doubt whether appellee's newly discovered evidence is of such weight or convincing character that, even when considered alone, it could be expected to render a different result reasonably certain upon a new trial; much less are we disposed to attribute such efficacy, weight and force to it when considered in connection with the appellant's counter proof afforded by the testimony of herself, her parents, her kinspeople, and· her friends, as well as medical experts, as to what has been her condition during this long period intervening between her recovery of judgment upon the original trial in March, 1928, and the filing of this new suit in November, 1929, and the time subsequent thereto covered by this proof.

This proof is, substantially and briefly stated, to the effect that appellant's injuries, for which the jury awarded her a verdict as for permanent injuries sustained by her, were in fact and are permanent injuries; that she has, even as yet, only partially recovered the proper use and control of her left leg; and that her nervous condition has remained and still is a matter of serious grievance and continual suffering for her; that the twitching of her face, evidencing this nervous disorder, is an involuntary one and not a mannerism or a voluntary one, as claimed by appellee; that, in further evidence of the lasting, hurtful effect of the electric shock received upon her nervous system, she was afflicted with and there was caused thereby an atrophy or a sagging of her left breast; that while this condition existed at the time of the former trial and was known and examined both by her own physician and Dr. Bradley, then assigned to her case by appellee, it was overlooked in the evidence heard upon the original trial; as to the cause of this condition of her breast, whether due to her nervous disorder produced by the accident, as contended by appellant, or due to childbirth or other causes, as contended by appellee, there is decided conflict of testimony.

There is further abundant testimony offered by

appellant to the effect that at no time before or subsequent to the original trial in March, 1928, nor until prior to the birth of her child in March, 1929, was she ever able to walk in the least and not then until she had relearned to walk; also that during this period of disability her mother and aunt did practically all of the household work and looking after her child for her, due to her continued disability; also that, when later trying to walk, her left leg would, without apparent cause, crumple or give beneath her, throwing her to the floor; that it often so happened while she was living at the Mitchell apartment, when she was lifted up by one of the Misses Mitchell, though their testimony is that her walk was then normal and that she never fell. · Also the testimony of Dr. McKenzie, taken upon an examination made of her while visiting her aunt in Florida, as to which so much is testified, is to the effect that her nervous disability continues to be a permanent one. To like effect is the testimony of her family physician, Dr. McGinnis, who states that not only is her nervous disorder produced by the accident permanent, but that the functional paralysis of her leg, as testified to exist upon the first trial, continues to leave its mark and handicap upon the use of this limb.

After a full and careful consideration of all of this voluminous new evidence offered by appellee in support of its grounds for a new trial, we are of the opinion that it fails in its quality of probative substance and cogency to measure up to the required standard that it should be of such conclusive nature or of such decisive and preponderating character as that it would with reasonable certainty change the verdict or materially reduce the recovery, if granted a new trial. Especially is such our conclusion when this newly discovered evidence is considered and weighed in connection with appellant's counter evidence, strongly tending to show the continued existence and permanency of her injuries, established as such by her evidence given upon the original trial. That is, we are of the opinion, that the events subsequent to such trial to which the new evidence relates has failed to establish her alleged recovery or to show that her injuries are neither permanent nor incurable.

Having reached this conclusion, it follows that the trial court erred in adjudging that the verdict be set

aside and a new trial granted. The judgment is therefore reversed, and the cause remanded, with instructions to set aside the order granting the defendant a new trial and to reinstate the judgment in plaintiff's favor.

Whole court sitting, except Judge Clay.

Thomas and Dietzman, JJ., dissenting.